UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | NO. 2:10-CR-130 |
| | ) | |
| CHAD ROYAL and | ) | |
| JASON KELLEY | ) | |

## REPORT AND RECOMMENDATION

As a result of an encounter these defendants had with the Morristown Police Department on September 26, 2009, a stolen firearm was discovered by the police in a car driven by the defendant Royal. The defendant Kelley was a passenger in that car. Since both defendants are convicted felons, they were indicted for (1) being convicted felons in possession of a firearm, and (2) possessing a stolen firearm.

Both defendants have filed motions to suppress all evidence of the firearm, as well as other evidence found in the car and on the person of the defendant Royal. (Docs. 18, 23). These motions have been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on February 22, 2011.

### *BRIEF OVERVIEW*

At approximately 5:00 a.m. on September 26, 2009, Officer Terry Sexton of the Morristown Police Department was on routine patrol in the Morningside area of Morristown. As he drove by the Morningside Car Wash, he observed two men whom, so he testified,

looked suspicious. Sexton pulled into the car wash parking lot and spoke to the men. Ultimately, other officers arrived; the defendants were searched; and the car in which they were riding also was searched. As a result of those searches, evidence implicating them in a local break-in and burglary was discovered, as well as the stolen firearm. The discovery of the firearm, of course, resulted in these federal charges.

## *THE BASIS OF THE INITIAL ENCOUNTER*

After observing the defendants standing in or near one of the car wash bays, Officer Sexton pulled into the parking lot and stated he wished to speak to them. They complied. The defendants insist that Officer Sexton had no *reasonable* suspicion, based on articulable facts, that criminal activity was afoot that justified a so-called *Terry*[1] stop. *United States v. Sokolow*, 490 U.S. 1 (1989).

Contrary to the defendants' argument, Officer Sexton had a well-justified suspicion that criminal activity was afoot. He testified that he believed these defendants were "up to something," or "up to no good;" that belief was warranted. Coin-operated car washes are tantalizing targets for thieves, and the patrol officers had been instructed by their superiors to pay particular attention to car washes because of robberies. It was 5:00 in the morning, and these men were on foot, at a car wash, and no vehicle was in sight. And even though it was an extremely warm night (all the officers were wearing short sleeves), these defendants were wearing "hoodies," and each defendant had his hood pulled over his head. The hoodies

---

[1]*Terry v. Ohio*, 392 U.S. 1 (1968).

2

were heavy cotton, and black (or at least dark-colored). Any reasonably intelligent person who observed these two men at this place, at that time, and dressed as they were, would have concluded – as did Officer Sexton – that they were up to no good. Not only was Officer Sexton's initial encounter with these men justified under *Terry*, he could have been properly criticized for neglecting his duty had he not questioned these men under the circumstances just described.

## *THE PAT-DOWN SEARCHES*

Officer Sexton was alone, and he was required to confront the two men. Under the circumstances described above, the situation was potentially dangerous. He radioed for back up assistance. Within an extremely short period of time, perhaps less than a minute, Officer David Campbell arrived at the car wash. When asked where they had been or had come from, the defendants vaguely responded that they had just been "walking around." Notwithstanding that neither man claimed to be jogging or exercising, they were sweating profusely, and they had on the cotton hoodies on a warm night. Sexton and Campbell's suspicions were heightened when they noticed what appeared to be building insulation fibers on their clothing.[2]

---

[2]The defendants' clothing, including these hoodies, has been in the successive possession of first the Morristown Police; then the Hamblen County Jail; and now the Greene County Jail, and obviously no effort has been made to preserve the integrity of the hoodies as far as the insulation fibers are concerned. That failure notwithstanding, the defendant Royal called as one of his witnesses Deputy Shawn Holt, the booking officer at the Greene County Jail and he brought with him the defendants' clothing. He was asked on direct examination by Royal's attorney if he could see anything that he considered to be insulation on the jacket. Deputy Holt looked at the jacket and then identified a small piece of insulation on the inside of the jacket.

Defendants were asked for identification; defendant Kelley had no identification, but Royal did produce a billfold with some identification. The officers checked with their dispatcher for warrants that might be pending against either of the defendants in Hamblen County and there were none.

Regarding the defendants' statements that they were just "walking around," Campbell noticed a lone car sitting in a church parking lot across the street, several hundred feet away. The defendants were asked if that was their car, and defendants denied any connection to that vehicle.

Officer Sexton asked the defendants if he and Campbell could conduct a pat-down of their persons for weapons and, according to Sexton, the defendants consented. Sexton frisked Kelley, and found nothing. Officer Campbell, however, frisked Royal and found some extremely incriminating items: a flashlight, knife, *screwdriver*, bag of marijuana, and a speedloader. A speedloader is a device used to quickly reload a revolver handgun; it allows all cylinders to be loaded at the same time, rather than one at a time. Contrary to counsels' argument, a speedloader unaccompanied by a revolver is not innocuous or benign; one does not usually carry around a speedloader unless there is a revolver nearby. The marijuana, of course, speaks for itself. And the screwdriver, under the circumstances existing at that time, was not innocent. A screwdriver, or something similar, is precisely what a thief would use to break into a coin box at a car wash.

These pat-down searches occurred no more than four minutes from the time Sexton initially encountered the defendants.

At this point, two ancillary issues arise. First, the defendants' consent to the pat-down searches was unnecessary. If there is a basis for *Terry* stop, the officer is entitled to conduct a frisk and limited search for any weapons that could potentially endanger the officer. *United States v. Hensley*, 469 U.S. 221 (1985); *Terry*, 392 U.S. at 29.

Second, there is evidence in this record from which the trier of fact *could* conclude that the defendants were arrested (without probable cause at that point) and *then* searched. That evidence consists of Exhibits 6, 8, and 9, all created by Sergeant Al Herrera of the Morristown Police Department. Exhibit 6 is an affidavit of complaint filed in the General Sessions Court for Hamblen County, in which Sergeant Herrera says that the burglary tools found in the defendant's pockets[3] were discovered as a result of a search *incident to an arrest*. Exhibit 8 is a police report "narrative," again prepared by Sergeant Herrera, in which he stated that "incident to arrest officers found property from the [victimized] business in the listed suspect's person and vehicle." Exhibit 9 is a Prosecution Report, authored by Sergeant Herrera, wherein he states that the burglary tools found on the defendant's persons were the result of a search incident to an arrest.

Sergeant Herrera was subpoenaed to attend the suppression hearing by the defendant Royal, but he was released by attorney Pierce and allowed to leave the courthouse, as a result of which no one, including this court, had the benefit of his testimony. Both Sexton and Campbell testified that they related their respective versions of what transpired at the car

---

[3] Actually, the defendant Royal's pockets.

wash to Sergeant Herrera, from which it could be inferred that they told Herrera that they searched these defendants after an arrest, not as a *Terry*-frisk for weapons.

Without intending to be too critical, this was more than a little bit sloppy. Nevertheless, it comes down to an issue regarding the credibility of Sexton and Campbell, and their testimony is believed. Moreover, commonsensically they would have patted down these defendants almost immediately upon their first encounter under the circumstances described earlier in this report. Herrera was not at the scene until some time later, and did not participate in any of the events at the car wash. Although he ostensibly prepared those documents from information supplied by the officers, the court concludes that he did so carelessly and without due consideration of the legal ramifications of the phraseology he employed. To repeat, the officers who testified at this hearing were credible, and they are believed.

In conclusion to this point, the officers requested permission to conduct pat-down searches of these defendants, albeit unnecessarily, and those pat-down searches were performed within a few minutes of the officers' initial contact with these defendants.

### *THE DISCOVERY AND SUBSEQUENT SEARCH OF THE VEHICLE*

*Terry* allows only a *brief* investigatory detention; it is possible for that investigatory detention to metamorphose into an arrest by the mere passage of time, which of course brings into play the question of probable cause *vel non*. *Houston v. Clark County Sheriff Deputy., etc.*, 174 F.3d 809, 814 (6th Cir. 1999). However, there is no arbitrary or rigid time limitation for a *Terry*-stop. *Id.*, 815; *United States v. Sharpe*, 470 U.S. 675, 685. If the initial

brief detention does nothing to allay the officers' suspicions, the officer may continue the detention and questioning: "If the purpose underlying a *Terry* stop – investigating possible criminal activity – is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* . . . ." *Michigan v. Summers*, 452 U.S. 692, n. 12 (1981). Here, discovery of the speedloader and the screwdriver not only did not dispel the officers' suspicions, they considerably heightened those suspicions, and reasonably so. In addition to the defendants' presence at a car wash at 5:00 in the morning, they were wearing rather incongruous clothing on a warm night; the hoods were pulled over their heads; Royal had a screwdriver in his possession; Royal had a speedloader in his possession; all of which reasonably indicated that they had engaged in, or were about to engage in, criminal activity beyond the criminal activity already confirmed by the bag of marijuana.

The defendants were not free to leave, but under the circumstances described, their continued detention remained justified, *Houston, supra*.

## *THE SEARCH OF THE CAR*

Another police officer, Corporal Shockley, overheard the radio communications of Sexton and Campbell, and he arrived at the car wash, at which time Kelley and Royal were sitting in the back of one of the police cruisers. Shockley searched the two men again, finding nothing else. He also *Mirandized* them.

This car wash, if not in downtown Morristown, certainly is close thereto; there are many buildings in the area. Shockley walked across the street to check some of the buildings

7

to see if there were signs of forced entry. One of those buildings was a church, and of course the church had a relatively large parking lot. As Shockley walked toward the church, he noticed a lone car parked in that lot. Campbell and Sexton had earlier noticed that car, and asked the defendants if it belonged to either of them, and both responded that it was not their car. At this point, another officer, Captain Dan Cliff, arrived at the parking lot and joined Shockley. As they approached the car, a Ford Tempo, they noticed that the windows were down, *and the keys were in the ignition.* In plain view on the back seat was a large shipping box with printing on it that indicated that it contained a computer printer. The shipping or address label indicated that it had been shipped to Michael Buckridge of the Back Relief Clinic, a business in the 11-E Stop & Shop building a few miles to the north on Highway 11-E. Shockley also saw in the back seat a guitar; there is a guitar shop located in the Stop & Shop building.

Shockley called his 911 dispatcher to obtain the phone number of Mr. Buckridge. He talked to Buckridge, who confirmed that the printer was his, and as far as he was concerned, it should still be in his business building.

Also in plain view on the rear seat was a piece of mail, from which Officer Cliff could read the name of the addressee: Chad Royal.

Defendants were then formally arrested for the theft of the items found in the back seat of the car. The vehicle was taken to the Morristown Police Department and there

thoroughly searched. As a result of that search, a firearm *apparently* was discovered.[4]

Whether these defendants have standing to complain about the search of their vehicle, since they disclaimed any connection to it, presents an interesting question. Interesting or not, there is no need to address it.

The defendants argue that "but for" their illegal detention by the officers, those officers would never have gone across the street, looked into their car, and thereafter observed in plain view the incriminating computer printer box and guitar. It is something of a "fruit of the poisonous tree" argument.

The officers' observation of the car and its contents by no means was the fruit of a prior illegal detention. First, and most importantly, the defendant' continued detention, for the reasons discussed, was not unduly lengthy or unjustified. Second, even if it be assumed for the sake of argument that their detention was unjustified, Sexton and Campbell noticed the car in the church parking lot within the first few minutes of their encounter with these defendants. Bearing in mind that the defendants denied any connection to the car, these officers would have been well within their rights to look into the car thirty minutes later, three hours later, or three days later. Their notice of it was utterly unrelated to any "lengthy" detention of these defendants, and defendants can hardly be heard to complain of a belated

---

[4]The firearm was not discovered on the person of either defendant, nor did anyone testify that it was discovered in plain view by either Shockley or Cliff. No one bothered to advise the court when the gun was discovered, or how. Apparently, defendants make no issue in this regard, claiming only that their continued detention at the car wash was unlawful and the officers' subsequent discovery and search of the car was a fruit of that poisonous tree.

inspection of this car after they had denied knowing anything about it.

The items in the car were in plain view, and warranted even further investigation – *viz.*, the call to Mr. Buckridge – to ascertain if those items were stolen. They were stolen, and probable cause existed to arrest defendants.

## *CONCLUSION*

It is respectfully recommended that defendants' motions to suppress, (Docs. 18 and, 23) be denied.[5]

Respectfully submitted,

                                                  s/ Dennis H. Inman
                                          United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).